Good morning, Your Honors. Thank you. As described in the briefing here, there are a number of legal issues with the district court's decision in this case, but I think the most straightforward basis for reversal here is that the district court failed to make all reasonable inferences in Ms. Wilansky's favor in deciding a 12b6 dismissal. That's a plain vanilla violation of the 12b6 standard. In particular, the court ruled that there was no seizure because the officers did not have an intent to restrain Ms. Wilansky, and instead that they had an intent to disperse Ms. Wilansky, and the court cited the Torres case. But the court made numerous inferences in the defendant's favor in concluding that the officers intended to disperse, not restrain her. And just to paint the picture, this case involves a situation in which there's a bridge, and at the north end of that bridge is a huge across those barriers that stop anybody from crossing it. On the law enforcement side of that barrier, there's then armored vehicles and... I don't know. How many pages do we have here explaining all that, including the careful district court opinion? Absolutely, Your Honor. So there are several different facts that were pled that I think make it, you know, if you make the inferences in Ms. Wilansky's favor, make it quite clear that there was an intent to stop her or injure her rather than an intent to disperse her. The first is that the officers attacked her, you know, so rapidly and were firing so many bullets at her that they effectively trapped her behind the... What does the record show on that? I mean, the procedure is confusing to me here. I mean, there's argument in the briefs about that this rapid fire wasn't alleged in the original complaint. Can you help me out? Is that in the operative complaint, the rapid fire? So I believe it was in the original complaint, Your Honor, and it was certainly in the summary judgment brief. Was it not in the deposition? Is that correct? No. The issue in the... I think the issue that the defendants have raised about the deposition is a question about whether the officers continued to fire at Ms. Wilansky while she was retreating from the barricade. Is that what you're talking about now, or... No. I'd say there's two stages here. The first is, you know, they say, we see you under the truck, move away from the truck. Mr. Joachinson says, there's nobody under the truck. Rather than replying to that, the officers just start firing at them rapidly. How's the district court supposed to deal with the inconsistencies between your pleadings? Between the first... The first complaint and the second complaint. So the first complaint was filed before we had any discovery. This was such a moving target as you presented it to the district court. I would say that when the first complaint was filed, we had limited information. We had had no discovery. And an example of that is that it was a John Doe complaint. We didn't even know who the officers were. We didn't know... We didn't have any video. We didn't have any audio. Well, that's true. But I mean, and the district court allowed discovery and then allowed you to amend the complaint and add the identity of the officers. But I think one of the district court's issues is the allegations changed as well. And setting aside the amendment of the complaint, I mean, did your allegations substantively about who fired when and how often change from the first complaint to the operative complaint? I don't believe so, Your Honor. I would say the only possible exception to that is the additional allegation that the officers continued to fire at Ms. Walensky while she was running away. There was an inconsistency as to whether law enforcement was shouting both at her and someone under the truck. Okay, so... That contradicted her evolving story throughout litigation that command was not directed at her. And then there was inconsistent allegations as to whether they fired at her while she fled, which contradicted her initial, her original complaint and deposition. So it sounds like there's... That's my take on the record. Okay. So it sounds like you're raising two issues, Your Honor. One is about the nature of the command that was given to her, and the second one is about whether the officers continued to fire at her while she ran away. On the first issue, I mean, there is audio of what that command was. And it, you know, I don't have... Does anyone dispute that that's properly before us in the motion to dismiss? I mean, I know it's discussed. I can figure out if anyone objects to that. I don't object to that. Absolutely, we are, you know, we stand behind what the audio says in terms of what the instruction was. But I think that audio, you know, it says, we see you behind the truck and under the truck. Get out and, you know, move away from the truck. It was not... You know, it seemed to be directed at somebody who was under the truck. And there was nobody under the truck. And certainly Ms. Walansky and Mr. Joachinson were not under the truck. And that is why he replied to it and said, there's nobody under the truck. And I think that like fundamental characterization of the events has not changed between the complaints. If there was slightly different rhetoric used in the two pleadings about it, it was not the intent that, you know, Ms. Walansky's narrative about what happened there changed. It has always been her position that nobody was under the truck, that the police appeared to seem to think that somebody was under the truck. And so they responded to say nobody was under the truck. And then the police started firing at them rather than... Well, they said to leave, right? They ordered a dispersal, and your client didn't disperse. I think the issue, though, is that the instruction indicated that the reason for... Well, that may be... Your client may have misunderstood or properly understood the instruction. But the question is, is the reasonable... Is the officer conduct reasonable at that point, right? And they issue an order. Your client may think it related to someone else. She didn't flee. And you're saying that's an unreasonable inference, that that was objectively reasonable? I think what we've pled is that they did not give her enough time to leave before they started firing. What law... I mean, where is the legal authority that says they need to give her... How much time did they have to give? I think they just need to give her enough time to comply. I mean... What's your best case on that? I think it's... I don't have a case that's specific... Your brief is shy. Well, let me... It's an avoidable case. Let me back up, because I think, Your Honor, whatever you think of that initial round of firing, at some point they hit her, and she started running away, right? And then she ran 30 yards away from that truck. That is undisputed. And that officer shot her with an explosive. And so whatever... So let me ask you about that. What was the... I assume you think the district court made an unreasonable inference at this point. I mean, what does the record or what does the pleading say about when that shot was fired? So she was 30 yards away. So she had complied with the order to move away from the truck. She was clearly not... She was clearly unarmed, and that was established even... Yeah, I know that, but the timing is what I'm interested in. Okay. I mean, because there seems to be some discussion about whether she was just in the process of fleeing or whether she had stopped and was gathering defensive materials or so. What does the pleading say about the timing? Okay. So I think the pleadings say that she was hit the second she stopped to pick up a piece of plywood as a shield. And I think the reasonable inference, and certainly the inference, a reasonable inference in her favor, was that given that, you know, Mr. Moll was 30 to 50 yards away at that point, she aimed and fired at her before she had stopped. Okay. Okay. And I think the... We tried to make that more clear when we amended the complaint, but that additional clarity there was struck by the court, you know. And so when we filed the second amended complaint, which the district court basically, you know, told us exactly how we had to write that complaint, that was removed from that complaint. But I think even under the second amended complaint, even the way the court wrote it, right, I think that it is still clear that the reasonable inference in Walansky's favor is that Moll aimed and fired before she stopped. Where do you come with the aimed inference? Well, he hit her, so the inference is that he aimed at her. Okay. And I would say that, you know, the fact that it hit her, like, exactly at the instant she stopped, which frankly I believe he testified to in a deposition on this, means that he, you know, he had to have the intent and pull the trigger before. And again, the deposition, is that before us? No. I'm just saying I don't think it's disputed in this case that he hit her the instant she stopped, meaning that the intent that he formed and him pulling the trigger had to have occurred before that. But, you know, we learned information about this during discovery, which is why the first amended complaint is more clear about this. What specifically, talking about the incident you were just talking about, that Officer Moll fired, what is it that converts that from a, assume for the sake of argument that I believe that there was a dispersal, the attempts to disperse prior to that moment, what is it specifically about that use of force that objectively manifests something other than an intent to disperse? I think the fact that he fired an explosive at her. It's the nature of the ordinance or the weapon. It's that. It's the fact that she was already 30 yards away from the truck, meaning she had effectively complied. What cases do I go to to look for those being relevant factors in a seizure and then relevant to the qualified immunity, where we've clearly established that those are factors that convert, again, you're accepting my arguments up to this point, right, a dispersal that converted into a seizure? So I think that there's three types of cases that you can look to on this. The first is cases that say officers may not use more than de minimis force against a non-resisting, unarmed. Let's stick with, are you familiar with the Kemp case? I'm not, Your Honor. Just Judge Kobus's November 2025 case? I'm not familiar with the case, Your Honor. Well, it's controlling. That's unfortunate, then. It follows Dundon, but in a factual context much closer to this case. Well, I mean, Dundon is a case in which I think there was no dispute that the use of force was intended to disperse. Here, I think this is a case in which Moll's use of force, certainly, with the explosive munition was not intended to disperse. And that's what I'm trying to burrow down on. Is it the nature of the force that converts? Like, the case that Judge Loken's referring to was a pepper ball that was, that the court found that it was a, that it was used to repel. Is it the nature of the force here that converts it, the weapon? It is three things, Your Honor. It is the nature of the weapon, the fact that it was an explosive. It is the fact that Wolanski had already complied and moved 30 yards away from the truck, so she had already dispersed. She was now as far back as other, you know, protesters were that had not been objected to by the police. So there was no actual need to disperse there. And number three, it's the fact that after Moll hit her, and, you know, it exploded and she was injured, the law enforcement officers cheered and laughed and congratulated him. None of that is But the dispersal was, the order to disperse was from the barricade, not the truck, right? Well, they're all, I think they're all very close together, Your Honor, and it was through a loudspeaker. No, there's significant difference because she'd been up and down the barricade multiple times. She had not, she had approached the barricade and been there for approximately 30 minutes. Prior to that, she was just on the bridge, which was south of the barricade. But prior and prior, prior to this day, or. I mean, she had been at a protest earlier, but in the instance in question, she got there around 2 a.m. and she was walking around the bridge and talking to people and nobody objected to that. And then she approached the truck, which was near the barricade, and she stayed there. Where was she during the midnight violence on top of the barricade? I believe that she did go to the bridge during that time, but I don't believe she, like, participated in that protest. But I don't believe that's part of the record one way or another. And I don't recall. Where do I go to look for the authority that the weapon used matters as far as whether on the objectively manifested intent? I mean, what, what, is there a case out there that explores that, that, that point that you're making that explains why that's the case? No, Your Honor, I think it's, I mean, to me, it is, it is like a basic common sense inference that if you're trying to disperse somebody and they're already 30 yards away. Let's say that's, I get it. I think the district judges in Minnesota have had kind of a dialogue about, about this issue, about, you know, I remember a hypothetical, whether a flamethrower that was used to disperse, whether the nature of that weapon means that it was a seizure, not a dispersal. But, but common sense, let's say I buy your argument on its face. It doesn't get you through the qualified immunity analysis, right? We need to find a case that establishes that principle. That it's a seizure? Right. That, that, that the weapon used puts officers on notice that, that they may be, even if they're engaged in repelling, that the use of a certain weapon may convert it to a seizure. In other words, where do I look for that on a QI analysis? Sure, Your Honor. I would say, number one, there's plenty of case law that says that use of these type of explosive weapons is excessive force, is excessive. And if you think that it's not a seizure, or that that's not clearly established, that's where you get to our Fourteenth Amendment argument, which is. Right, right, right. But I, and I don't know that you have a clearly established case in the Fourteenth Amendment either, but are you telling me there's not one that makes this distinction on the Fourth Amendment analysis? It is, I do not believe that there is a case directly on point that says the use of an explosive device means that it's not an intent to disperse. And why doesn't that matter for the Fourth Amendment purposes on qualified immunity? Because if Officer Moll intended to injure her, then you, then there is a seizure, and it's, it is clearly established that intending to injure somebody with an explosive device is a seizure. I mean, even under Torres, I mean, that would satisfy that test. Your Honor, I have five minutes left, and I want to make sure I reserve it for rebuttal. What was the, what you describe as explosive device? What was used? It's something called a signaling warning munition, Your Honor, which is effectively, I think the easiest way to understand it is that it is a flashbang that is embedded in a bullet so that you can fire it out of a shotgun rather than throwing it. But it is effectively the same thing as a flashbang. It explodes and, you know, creates a lot of heat and a lot of light and a lot of sound. And so, but I'd like to reserve my last for rebuttal. Thank you, Your Honors. Mr. Grenholms? May it please the Court? Counsel? Justices? Counsel? My name is Sean Grenholms. I'm here representing the Defendant Appellees, Morton County, Morton County Sheriff Kyle Kirkmire and Municipal Defendant Officers Thomas Gross, Matthew Hansen, Glenn Ternus, Justin White. So, I would like to first start by addressing some of the arguments that Appellant's Counsel has raised before this Court. Woloski's counsel concedes that the applicable standard is whether or not the officer's conduct met, manifested, objectively manifested an intent to restrain as opposed to an intent to repel or disperse. Her argument is that she has alleged sufficient facts in her pleadings to establish a plausible claim of intent to restrain. The district court concluded, no, that's not the case. District court properly and correctly made that conclusion. Now, a lot... Counsel, there had been discovery in this case? There was discovery. So, this case has been going on for a very long time. So is the result here a judgment on a motion to dismiss or was this essentially resolved on summary judgment? This was resolved on a Rule 12 motion to dismiss in relation to her second amended complaint which was filed many years after the case was originally started. Procedurally, there was an original complaint. We filed a Rule 12 motion to dismiss. The Court partially granted the Rule 12, converted the rest of it to summary judgment. We conducted a limited discovery, limited to the issue of qualified immunity, filed supplemental briefing. Seven months after that briefing had been submitted, Woloski asked for leave to amend to only identify the officers, the officer who allegedly deployed the explosive munition. The Court granted that request. They filed a first amended complaint. That first amended complaint was much broader than the Court authorized, including not only identifying John Mullett as the officer allegedly deploying an explosive device, but also adding additional causes of action against numerous additional officers, raising new causes of action for failure to intervene. Basically, and as the District Court concluded, basically it was a complete redo over on the pleadings in the lawsuit. So that's why the Court struck that first amended complaint or specific pleadings that weren't consistent with the plaintiff's summary judgment briefing on the converted motion for summary judgment, which is what the Court authorized for the day. So you're here on behalf of Officer Mullett, right? Is that, I just want to make sure I've got the right lawyer for the right case. Yes, correct. I represent Officer Mullett. All right. Proceed. So after he struck those and directed that you have to limit your amendments to what was alleged in the summary judgment, that's where the second amended complaint, which is now the operative pleading in this case, came about. What does the complaint, the operative complaint, say about the timing on Officer Mullett's use of what's been described as the signal munition? Sure. So here's what it reads, and this is in your joint appendix at 359, at paragraphs 145 through 148. Here's the allegations on that. Quote, over the course of the, and this is starting from the point when she's running away from the barricade. Over the course of the next few seconds, Sophia ran approximately 30 yards south. Sophia saw a piece of plywood on the ground as she was running south. Sophia stopped at the plywood and attempted to pick it up to use as a shield. But just as Sophia stopped and began to bend down toward the plywood, Defendant Mullett intentionally hit her with an explosive munition. Is there a reasonable inference that, that Defendant Mullett fired before she stopped and does it matter? I think that's an unreasonable inference. She specifically says not only did Walonsky stop proceeding south, but she was bending down to pick up the shield. So two different actions, not all, you're not running and bending down. She says she stopped and, she stopped at the plywood and attempted to pick it up to use as a shield. I don't believe it's a reasonable inference and the Court's not required to make unreasonable inferences in relation to a Rule 12 motion to dismiss. So no, I don't believe, and I think the only reason she's trying to make that argument now obviously is to get past this Rule 12 issue on whether or not there was actually force being applied as she was running and whether she was having force applied while she was complying. What about the type of weapon used here? Your colleague on the other side has suggested that there's a reasonable inference of intent here and that this is not the sort of weapon, in other words, that while the weapon may be used to repel in certain situations, while it's aimed at someone, it is not for that, used for that purpose, which means that there was an intent here or a reasonable implication that there was an intent to detain or restrain. Again, I don't think that's a reasonable inference. What she's talking about, an aerial warning munition, and just to clarify for the record, I know this is a Rule 12 and she's alleged that this is what happened. Law enforcement from the very beginning has always denied that the explosion resulted from anything that originated from law enforcement, but that aside. Well, what have they alleged, that her arm was blown off by something else? We haven't. So the plaintiff frames the pleadings. Understood. But you've raised the issue that there was discovery. Is there anything in the discovery that says that? Yes, in the discovery, and of course, that's, you know. If you don't want to go there, I'm not going to force you to go there. In discovery, there is testimony by officers on the scene who witnessed silver canisters being rolled up to the general vicinity of the hurricane. I get where you're, okay. But that is not, that is not before us now. That is not before you right now. The allegations in our complaint are that Officer Moll fired. Exactly. That's what the allegations in the complaint are. But no, I don't believe it's a reasonable inference to say that Moll shot at her and it took. Why not? Because 90 yards distance. So he's firing from a 12-gauge shotgun. Is it going to, if she, so what she's saying, arguing here, and not in the pleadings, is arguing that he pulled that trigger while she was still running, before she stopped, and as she's bending down, it took that time frame for that 12-gauge shell to travel 90 yards? It's just not a reasonable inference. I don't think the court can reasonably make that inference. So the only reasonable inference is that before selection. Is there anything in the record about the time it would take for such a shell to travel such a distance? There's not, Your Honor. There's nothing in the record on that. One of the things that's odd about the case is the way it was a motion to dismiss converted to a summary judgment motion. We've got all the discovery, and now we've got a motion to dismiss. And I'm urging you to talk about things that go to a summary judgment motion, but that's not where we're at.  So why shouldn't this particular issue just go back, setting aside the other use of force, the other defendants? Why isn't it premature when there seems to be all this evidence lurking in the background that's already in the record? Thank you, Your Honor, for that question, because we're talking about qualified immunity. And this Court has repeatedly said, and the United States Supreme Court has said, the whole purpose of qualified immunity is to resolve these issues of objective It's a little late for a quick resolution on this case, don't you think? It is, but the case law does say it's supposed to be resolved at the earliest possible time, and that can be either Rule 12 dismissal motion, it can be a summary judgment stage, or it can even be at trial. They can still address the qualified immunity issue at that point in time. Yes, this case drugged on for years. There was a lot of And I don't want to get into who's responsible for that. Sure. But it's just an odd situation on a motion to dismiss where we've got all this stuff in the back. Qualified immunity analysis doesn't negate the inferences to be in favor of the plaintiff's allegations. I agree with that. That is true. Reasonable inferences are to be made in the plaintiff's favor. I agree with that. But we're not talking about reasonable inferences here. Everything that the plaintiffs are arguing about are not alleged in the pleadings. They misstate their own allegations. And I can go through. They have six aspects of what they claim. They have alleged they create these favorable inferences. Not a single one of them stands up. And that's addressed in the briefing, but I can certainly go through some of those if you like. So as to so he alleged that on the inferences, he alleges there's no reason to repel. Well, Attorney Stoll started to discuss some of the allegations in the complaint about the history, the events leading up to this particular incident. And it is kind of, it'd take me too long to go through all of that. But yes, there was a large scale riot that occurred a few hours before this incident at this very location. Walonsky admits in her pleadings that she was there during that riot, that she saw law enforcement deploying beanbag rounds, flash bangs, tear gas, water during that. And she saw this happening at this exact location. But it's undisputed that the riot was over by the time of this incident, correct? That the situation had peaceful, however you want to describe it, that the riot had, that the protesters other than the plaintiff and one other person had dispersed. True. The protest by about midnight had started to calm down. Quantity of protesters and officers dropped considerably at that point. But the barricade was still manned by officers. It's a defensive barricade. Walonsky admits the bridge was closed, that they had been negotiating to get the bridge closed for months. That establishes just her mere presence was unlawful. And I'm sorry, Your Honor, remind me of your question. I don't think there is one pending, so. Okay. Well, essentially what I was going with that is that the events leading up to, and what she alleges in her pleadings, is that there was a very tense situation. She admits in her pleadings that other protesters during those hours prior had pulled, backed up a semi-truck, two of these burnt-out trucks chained to the concrete barriers forming a part of the barrier and drug it away. They came back with the semi again to try and pull the second one away, and law enforcement were able to thwart that. Now she doesn't allege it, she doesn't allege how they thwarted it, but there was use of force involved. And so obviously the officers are going to be very mindful of anyone messing around or tampering with that one remaining burnt-out truck forming a part of that barrier. And so, and then she admits that she placed herself directly next to that truck. She admits that the warning, and counsel admits that we can consider the audio in this case, this Court's case law in Ching as trustee for Jordan versus City of Minneapolis, has specifically said, videos of an incident are necessarily embraced by the pleadings and we will consider those videos here. So here's what the warning was. Quote. Did you just read from a case of ours? I did. What was it? It was Ching as trustee for Jordan versus City of Minneapolis, 73F 4th 617 at 621 8th Circuit 2023. Does anyone dispute that we can look or listen to the audio?  Okay. Look to her deposition. Nobody disputes that. The language is crystal clear. It's an amplified warning over an amplification system attached to the bearcat out there. They said, quote, we see you behind the truck and underneath the truck. Get out now. Return to the south side of the bridge. Otherwise, we will use less lethal munitions, unquote. What does the complaint say about, I mean, the use of force was deployed. She fled. At some point, she alleges that she cried out, basically, don't shoot. I'm leaving. What is the plea? When did that occur in the timeline as set forth in the complaint? So her allegation is that after she got struck in the arm while she's hiding behind a shield behind a truck, she realizes she's no longer safe hiding behind that shield. She starts running as fast as she can south. And while she's running, she yells at. Then she says, the next thing she alleges is, then she stopped. And as she's bending down to pick up the shield is when the explosive munition struck her. She says, and... Well, isn't there a reasonable inference that when she's basically surrendered and is fleeing the scene, that police conduct after that, when she basically verbally says, I'm out of here, don't shoot, and they continue to fire, why isn't there a reasonable inference that when officers do that, that at some point, at least, their intent converts from dispersal, which they've succeeded in or are succeeding in, into a seizure? Well, one thing I want to point out about this allegation that you're referencing, nowhere does Walonsky allege the explosive munition largely fired by Maul that destroyed her arm was fired while she was running away from the barricade. And then as to the, and what you're referring to are like beanbag rounds, non-explosive munitions while she's running away. She only first raised that, and it doesn't appear anywhere in the Second Amendment complaint. There's nothing about them shooting at her because the judge struck that. She brought a second lawsuit then after. But the Second Amendment complaint includes her verbal, you know, surrender. It does, but it doesn't allege any forces being applied against her as she's running. But it does allege force after she said that. Yes, but that, the only force that alleges is the explosive munition after she stops and as she's bending down to pick up a shield, which the officers were seeing protesters use shields all night long. But, so, the point being is that the original, the operative including the Second Amendment complaint doesn't make any allegation of force being used against her from the time she's running from the truck until she actually stops, stops complying with the command to go south off the bridge. Now, in her companion case, the second complaint she filed after the Second Amendment complaint in the consolidated appeal here, that's the first time she raises this issue of other officers firing as she's running south. And this was, this allegation wasn't raised until 2022, four years after the case was commenced and seven years after the incident. But it's not in the operative complaint. We shouldn't be looking at it. Is that your point? I mean. Well, it is in the, it is a consolidated appeal. So, you're looking at both the operative complaint in the primary appeal and her consolidated appeal. But the reason why you shouldn't consider it, it's a different reason, is directly contrary to her sworn testimony during her deposition. Well, she says she doesn't remember, right? Is that right? I mean. That, no. Here's what she said. So, what she testified to is. I don't, I can look at it. I don't want to belabor the point. Sure. I know you have a colleague here and I know you're running short of time. So, I'll look that up. But I take your point, so. And thank you for reminding me of that. I'm out of my time. Thank you. Ms. Spork-Yellow? Yes. Good morning, your honors. May it please the court. My name is Jane Sportello and I'm here on behalf of the eight state defendants of the North Dakota Highway Patrol. The district court's dismissal of these eight unqualified immunity grounds should be affirmed. And before getting into my planned remarks, I just want to respond to a couple points that have been raised. I wanted to return to the reference of the recent Kep V. Sarpy County case. I think that's really applicable. Is the analysis different for the state and the county individual defendants? Is the... So, in general qualified immunity, no. I will note that only three of the state defendants are actually even alleged to have applied any force at all. Or even, excuse me, only three are attempted to have used force on Walensky. That would be state defendants Dvorak, Arndt, and Skar. Sergeant Dvorak was alleged at deploying stinger ball grenades near her without touching her in any way. Sergeant... Trooper Skar was alleged to have aimed at her with a bean bag round but not actually hit her, deployed bean bag rounds at her. And Arndt was also alleged to have deployed bean bag rounds at her and hitting her with a single round in the arm. And those deployments I'm just talking about were taking place while she was still behind the burned out truck, while she was still behind that barricade. And so, turning to the other five defendants, five of the eight state defendants are not alleged to have used any force or really to have done anything at all. They're merely alleged to have been present and failing to intervene. But, you know, the court should uphold this finding for a couple reasons. First, the plaintiff doesn't even meaningfully contest the court's dismissal of these five in her opening brief. She doesn't argue the failure to intervene. Second, you know, just returning to the point we've all been talking about, the perspective of the reasonable officers on the scene at the bridge are that protesters are behind the truck, that protesters are underneath the truck. A command has been given to disperse and they're not dispersing. I think... You know, it seems to me the way this has been briefed, we're into qualified immunity generally. And if the award of qualified immunity generally was wrong, we remand for all this individual stuff. And you're just... And the briefs waste a great deal of our time asking us to do everything now that the district court didn't address. Yes, Your Honor. So I would disagree with that for a couple of reasons. First, again, like Mr. Reynolds said, qualified immunity has to be addressed at the earliest stage of the litigation, right? And these dismissal of the claims of the law enforcement defendants is really years overdue at this point. And second, especially for those five, and I would argue for all of the state defendants, it's very, very clear... Did the district court do them individually? So the... The required individual analysis for each defendant that our cases demand? Or did the court just said, you know, I don't have to go there because qualified immunity applies to all of them? Your Honor, the district court did specifically dismiss the failure to intervene plaintiffs on due to the lack of an underlying constitutional violation, due to the lack of an underlying seizure. He... So he dismissed all of them on qualified immunity grounds. It is true that the district court didn't get into the failure to intervene test with regards to those five. But I think the analysis here is just very clear to all eight of the state defendants, right? Aren't Dvorak and Starr, even if they did deploy less lethal munitions, that there's no case law putting them on notice that that would have been objectively reasonable in light of the threat that was created by these non-dispersing protesters, right? And I mean, there's not a single case that deploying less lethal without injuring someone at all in that situation is... Could possibly, you know, violate the constitutional right, let alone one that was clearly established. And I see our time is running out. What pages of the district court opinion are you relying on? Am I relying? I'm sorry, Your Honor, my time is up, I don't... When you say that the district court decided what you want to... What you now are doing, and therefore we can review it now. When... So the... It's a long opinion. I didn't study every detail, but I don't think that's in there. Your Honor, what's in there is that he affirms the dismissal of all eight state defendants for qualified immunity because there was no underlying seizure here. Okay, yeah, that, I'm... Okay. Yes. And we would ask that that be affirmed. Thank you very much. The rebuttal? Thank you, Your Honor. I want to make one point right off the bat. We spent a lot of time discussing the intent to restrain versus intent to disperse issue. But I believe that Walansky deserves reversal here, even if she does not establish intent to disperse, even if she does not establish intent to restrain. Torres has two tests, and we've really only talked about the seizure by force test. There's also the seizure by control test, and that really does not require... You're going to argue what wasn't argued before. You can't do that on rebuttal. Well, I... You can respond to the police arguments or say more about what you argued before. You can't raise new arguments. It's unfair advocacy. Okay, I'm sorry, Your Honor. I need to... My colleague said that it was undisputed that if you guys established an intent to disperse, there's no seizure, and therefore, no claim here. And I'm just disagreeing with that because there's two different ways to establish seizure. The other point I want to make is that if the court endorses the district court's decision on both the lack of seizure and its 14th Amendment analysis, the upshot of that will be a situation in which law enforcement is allowed to use objectively unreasonable force against protesters because they... You know, as long as there's an intent to disperse, there'll never be a seizure, and therefore, there's no Fourth Amendment claim. And, you know, in what I believe is a violation of Kingsley... I heard cases like Bernini don't say that. Bernini is pre-Kingsley, but Bernini was also one in which I believe there was no dispute over whether there was an intent to disperse. Is that your understanding as well, Your Honor? I guess your way out of that, that you're arguing, is there's something inherent about the kind of force that was used here that suggests... In other words, I get the point you're positing here, and that is if the officers are intending to repel, they can do whatever they want. I take the counterpoint to be, well, there are certain uses of force that are inherently not the sorts of types of force that can be repelled, right? In other words, your argument here is a flashbang. I've quoted the district court where it talked about a flamethrower, where the objectively reasonable observer would say, like, this wasn't an attempt to repel. Is that a layman's sort of attempt at what you're arguing here? And, Mike, assuming I buy that, I still don't find, for the purposes of qualified immunity, a case that would be sufficient in this case to put the officers on notice of that, right? I mean, you're not showing me a case. I get the argument, and I appreciate it. Sure. I think there's two sets of cases on this. One is just the general line of cases that extends back to Garner in the 1980s that says, using more than de minimis force against people who are not behaving violently and not an immediate threat is... Garner was deadly force. True, but, I mean, there is a long line of cases... Procedure announced. The... Well, sorry, what was I... Well, it can still be unreasonable force under the Fourth Amendment, but it's not a seizure, per se, unless it's deadly force. Well, so, Your Honor, then I would say, if it's not a seizure, then it's analyzed under the Fourteenth Amendment, where you don't need a seizure, and Kingsley says that you get the same excessive force standard of objective reasonability. All right. We have not applied Kingsley beyond those in pretrial detention, right? The Eighth Circuit has not done so yet, but the Second Circuit has, so you'd be creating a circuit split. I've read your brief, but we've hinted that we've at least hinted that we would limit Kingsley as others have. Well, I don't think any court has read Kingsley... The debate in the circuit's fine, you know, take it up to the nine who can decide that. I'm out of time, Your Honor, so I'm happy to stop, but I don't believe any circuit has read Kingsley to only apply to pretrial detainees. Thank you.